# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00755-CR

**Kasey Shannon Calvery, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 27TH DISTRICT COURT OF LAMPASAS COUNTY
### NO. 10873, THE HONORABLE JOHN GAUNTT, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Kasey Shannon Calvery guilty of continuous sexual assault of a child and assessed punishment at twenty-five years in prison. *See* Tex. Penal Code §§ 12.22, 21.02. Calvery contends (1) that the trial court improperly commented on the weight of the evidence by calling the complainant "JV1"—an abbreviation of "Juvenile Victim 1" in the jury charge—and (2) that the State failed to prove his identity at trial. We will affirm the judgment.

## BACKGROUND

Calvery was indicted for continuous sexual abuse of his stepdaughter, Alice[1] more than a decade after the alleged abuse occurred. The indictment referred to Alice as "JV1," a pseudonym used by an investigating officer because she was a juvenile when the offenses were alleged to have occurred. Three witnesses testified at trial: Alice, her mother (Mother), and

---

[1] Alice is a pseudonym for the complaining witness.

Texas Ranger Justin Duck, the investigating officer. In addition to Alice's allegations against Calvery, the testimony concerned custody arrangements for Mother and Calvery's sons because Calvery alleged that the allegations were fabricated to support a custody dispute.

Mother testified that she had two children—four-year-old Alice and a one-year-old son—when she began a relationship with Calvery in 2001. Mother and Calvery had a son in 2002 (Bill) and another son in November 2005 (Carl).

Alice asked family members to leave the courtroom before her testimony. She said she did not feel comfortable saying some of her testimony in front of them or anybody. Alice testified that Calvery sexually abused her beginning when her youngest brother was born (while Mother was in the hospital) until she was about twelve years old. She testified that from 2007 until around 2010 Calvery came into her room in Lampasas at about 11 p.m. or midnight on multiple occasions. She would wake up while being undressed. He used his fingers or mouth to penetrate her vagina. He would undress them both, then put her on top of him and move her body on top of his, sometimes touching her vagina with his penis. Other times, he would touch her mouth with his penis. Alice testified that he would whisper to her to move her hips on top of his. Alice testified that she would pretend to be asleep and agreed she may have told Ranger Duck that she kept her eyes closed. She said that sometimes he would ask her if she wanted him to stop; she would say "yes," and he would stop in the moment but did not stop the acts. She testified that these incidents sometimes occurred once a week and that other times there were weeks in between. She estimated that about seventy-five incidents occurred.

Alice testified that she recalled no daytime inappropriate behavior, that there was no written evidence of the incidents, and that Calvery never specifically told her not to tell anyone.

2

Alice testified that she did not report the incidents because she was afraid that she would be in trouble, that no one would believe her, that her mother would be upset, and that if her report caused a divorce that her mother would not be able to support them financially. She said that when she was in third grade she mentioned hypothetically to a friend the possibility of a stepfather acting like a boyfriend or kissing his stepdaughter, and the friend said it would be weird, sparking Alice's fears of being disbelieved or embarrassed. Alice testified that she did not tell anyone after the divorce for many of the same reasons and because she feared Mother would be angry that she had not said anything. She acknowledged being around Calvery and speaking with him after the divorce a few times at her brothers' sporting events, their custody exchanges, and a few of her son's sporting events.

Mother testified that Calvery moved to another city and in 2014 married a woman with a daughter.

In 2018, when Alice was twenty-one years old and living with her husband and child, she went to a waterpark with her siblings and extended family. Mother answered a phone call from Calvery on Bill's phone. Mother testified that Calvery was upset because his current stepdaughter had accused Bill of "inappropriate behavior." Mother testified that when Alice heard the accusations, she "kind of lost it" and was crying and upset and "kept saying she didn't want [Bill] getting in trouble for something that [Calvery] did." Alice got on the phone with Calvery and, she testified,

> I told him that if he had done something to his stepdaughter and was blaming it on [Bill], that he wouldn't be getting away with it. And I told him that I did suspect that he had done something to his stepdaughter and was somehow putting that blame on [Bill] because I knew what had happened to me."

3

Alice said she did not at that time discuss with Mother details of Calvery's actions.

After her outburst at the waterpark, Alice began going to therapy. She testified that she did not go to the police because she was trying to process the situation. She testified that she had thought she would never tell anybody about the incidents and, because it came out as quickly and unexpectedly as it did, she had to process the fact that she was going to have to deal with it. She said that at one point she spoke to Child Protective Services investigators because they interviewed her after speaking to Bill and Carl, but she was not sure what they were investigating.

Alice testified that she came forward in 2020 because she was afraid that Calvery—then a high school teacher—would continue to abuse young women. Alice testified that she had not been concerned in 2013 about how a potential report would affect her brothers but was very concerned in 2020 about negatively affecting them. She said that Bill called her in 2020 to tell her that she was ruining his life, Calvery's life, and Carl's life. She said she was hurt by the choices Bill had made regarding their relationship but that she and Carl maintained a close and good relationship. She testified that she did not talk about the incidents with Carl because she did not want to strain their relationships. She testified that the suggestion that she and Mother invented the accusations because of a custody issue was "laughable" and meritless because the experience had been so painful. She said she had nothing to gain from testifying except that she wanted to prevent Calvery from harming another person.

Alice testified that she had only one interview with Ranger Duck. He contacted her for additional information like therapists' notes, but did not interview her other than a 37-minute recorded interview that seemed longer to her.

Mother testified that the family moved to Lampasas in May 2006. Alice had her own room in every house they lived in. At one of the houses, the parents' room was on the opposite side of the house from the kids' rooms. Mother testified that in the years of 2007 to 2010 she normally was asleep by 10 p.m. and that she was not a light sleeper. Mother testified that Calvery was very affectionate toward Alice, wanted her to sit with him and watch television, and never punished her. She said that Calvery was much harder on her son from the previous relationship.

The couple filed for divorce in January 2013 and were divorced in April 2013. Mother testified that, as far as she knew, Alice and Calvery had no contact after the divorce except when Alice was taken to the hospital after a car accident in 2013 and at the younger boys' sporting events.

Mother testified that she had no indication that Calvery had abused Alice before Alice's outcry at the waterpark. Mother testified that she did not report Alice's allegations to police because Alice was not ready to do so. Mother testified that Alice spoke to a CPS worker in 2019 but was told that, as an adult, she had to go to the police.

In March 2019, Bill told Mother he wanted to live with Calvery, and Calvery filed to modify the custody order in April 2019. The parents engaged in mediation and agreed to a "trial run" for Bill to live with Calvery. The custody order was modified by agreement in March 2020. Carl continued to live with Mother.

In July 2020, Alice reported her allegations about Calvery to law enforcement. Alice asked Mother to attend the interview, which Mother testified was when she learned details of Alice's accusations. After the investigation, Mother filed a petition to modify the custody agreement as to Carl. She said that her relationship with Bill became strained after he moved to

5

live with Calvery and that she feared that Calvery would try to take Carl away, too. She testified that Bill cut off communications in May 2021. Mother denied orchestrating Alice's allegations to obtain custody of Bill and Carl. She testified that Carl has a good relationship with Calvery and visits him often, especially over the summer. Carl was a senior in high school at the time of the trial.

Duck testified that he interviewed Alice and Mother the day after Mother contacted him. He said that the joint interview was unusual, but because of Alice's emotional distress from the assaults, he did not want to question Alice in a room with two unfamiliar men (himself and a Lampasas police officer). He described Mother as grateful to have someone to speak to and horrified that these acts happened in her home. He described Alice as very sad, very matter-of-fact at times, but also emotional. He said he got no indication that the story was fabricated. He requested a nurse examination of Alice and found no major inconsistencies between what Alice told him and what she told the nurse. Duck testified that he saw nothing in Alice's therapists' notes that contradicted anything that he had learned from her interview, the nurse's report, or other investigation.

Duck testified that the first incident Alice reported was the day Carl was born. He said that Calvery told him that Mother's parents were in town when Carl was born, but Duck did not know where they stayed; Calvery told him he was not sure who took care of the older children while Mother and Carl were in the hospital. Duck testified that Alice said the Lampasas incidents occurred from when they moved to Lampasas in May 2006 until the summer of 2009. After reviewing the transcript of the interview with Alice, Duck acknowledged that Alice said "I always had my eyes closed" during the incidents.

6

Duck said that, because of his caseload, he did not interview Calvery until ten months later; another Ranger tried to interview Calvery, but he was not home when the Ranger stopped by. After the video of his interview with Calvery was played for the jury, Duck testified that Calvery said that Alice made the allegations because she and Mother were mad about the custody dispute over her brothers.

Duck testified without objection that he assigned Alice the pseudonym "Juvenile Victim 1," abbreviated as "JV-1." He testified that pseudonyms are assigned because "[s]urvivors of sexual assault are afforded that right within the law enforcement community so if they come forward, they can request to be referred to by pseudonym in any and all law enforcement reports."

## DISCUSSION

By his first issue, Calvery complains that the "trial court's insistence on describing the Complainant as 'Juvenile Victim 1' was an improper comment on the weight of the evidence and alleviated the State's due process obligation of proving its allegation." Calvery focuses on the application paragraph of the jury charge in which, over Calvery's trial objection, "the trial court referred to the complaining witness as 'JV1,' which stands for 'Juvenile Victim 1,' six times." By his second issue, Calvery complains that the State failed to prove his identity.

**The trial court's charge was not harmful error.**

Calvery complains of the use of the term "JV1" in the following passage from the jury charge:

> [I]f you believe from the evidence beyond a reasonable doubt, that the defendant,
> Kasey Shannon Calvery, between on or about the 1st day of September, 2007, and

7

on or about the 1st day of September, 2010, in the County of Lampasas, and State of Texas, as alleged in the indictment, committed two or more acts of sexual abuse against JV1, during a period that was 30 days or more in duration, said acts of sexual abuse having been violations of one or more of the following penal laws:

- aggravated sexual assault of a child by intentionally or knowingly causing contact with the sexual organ of JV1, a child who was younger than 14 years of age, by the defendant's sexual organ;

- aggravated sexual assault of a child by intentionally or knowingly causing the penetration of the sexual organ of JV1, a child who was younger than 14 years of age, by the defendant's finger;

- aggravated sexual assault of a child by intentionally or knowingly causing contact with the sexual organ of JV1, a child who was younger than 14 years of age, by the defendant's mouth;

- aggravated sexual assault of a child by intentionally or knowingly causing contact with the mouth of JV1, a child who was younger than I4 years of age, by the defendant's sexual organ;

and at the time of the commission of each of the acts of sexual abuse, the defendant was 17 or older and JV1 was younger than 14 years of age, then you will find the defendant guilty of the offense of Continuous Sexual Abuse of a Child, as alleged in the indictment, and so say by your verdict. (Verdict Form A).

Verdict Form C also used the term "JV1" to describe whose sexual organ was contacted or penetrated. Calvery contends that the use of "JV1" was the equivalent of saying "juvenile victim" because of Ranger Duck's testimony. Calvery argues that the court thereby improperly commented on the weight of the evidence and relieved the State of its evidentiary burden to prove that Alice was a juvenile and a victim. *See Whaley v. State*, 717 S.W.2d 26, 32 (Tex. Crim. App. 1986) (holding that "[a] charge that assumes the truth of a controverted issue is a comment on the weight of the evidence and is erroneous."); *see Grady v. State*, 634 S.W.2d 316, 317 (Tex. Crim. App. 1982) (observing that the "trial court in its charge to the jury should never give the jury an instruction which constitutes a comment by the court on the elements on the

alleged offense, or assumes a disputed fact"). Calvery contends that characterizing a complaining witness as a "victim" in the charge requires reversal, citing *Veteto v. State*, 8 S.W.3d 805, 816-17 (Tex. App.—Waco 2000, pet. ref'd), *abrogated on other grounds*, *State v. Crook*, 248 S.W.3d 172, 177 (Tex. Crim. App. 2008), and *Talkington v. State*, 682 S.W.2d 674, 674-75 (Tex. App.—Eastland 1984, pet. ref'd).

Even if we assume the charge in this cause was erroneous, the error did not harm Calvery. Where jury-charge error has been preserved by an objection, *see* Tex. Code Crim. Proc. arts. 36.14, 36.15, reversal is required if the appellant has suffered "some harm" from the error, which means the error "was calculated to injure the rights of the defendant." *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020); *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g) (setting forth procedure for appellate review of claim of jury charge error). "Some harm" means "any harm, regardless of degree." *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986). But the harm must be actual rather than theoretical. *Reeves v.* State, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). Whether harm exists is based on four factors: (1) the entire jury charge, (2) the state of the evidence, (3) the jury arguments, and (4) any other relevant information as revealed by the record as a whole. *French v. State*, 563 S.W.3d 228, 235-36 (Tex. Crim. App. 2018).

The charge did not include the word "victim" in the objected-to portions, and the charge did not include the phrase "juvenile victim" anywhere. The term "JV1" was isolated to the excerpt quoted above and Verdict Form C. The charge explained the term "pseudonym" and how a pseudonym became part of the record. Regardless of the pseudonym, the jury charge did not direct the jury to find Calvery guilty. Instead, it expressly instructed the jury that "[t]he state has the burden to prove every element of the offense beyond a reasonable doubt," that "[i]f it

9

does not, then you must find the defendant not guilty," and that "[i]f, after you have considered all the evidence and these instructions, you have a reasonable doubt about whether the defendant is guilty, you must find the defendant not guilty."

The use of "JV1" in the charge tracked the indictment and unobjected-to testimony. A hypothetically correct jury "charge would be one that accurately sets out the law [and] is authorized by the indictment." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "law as authorized by the indictment" means the statutory elements of the offense as modified by the charging instrument. *Root v. State*, 615 S.W.3d 920, 927 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd). The victim's name need not be proved with exactness, but the State must prove that the victim alleged in the indictment is the same person as the victim proved at trial. *Johnson v. State*, 364 S.W.3d 292, 295 (Tex. Crim. App. 2012). "JV1" was the only name used for the complaining witness in the indictment.

Though Alice used her name when testifying, Ranger Duck explained without objection that he assigned Alice the pseudonym "JV1" when investigating the allegations because "[s]urvivors of sexual assault are afforded that right within the law enforcement community so if they come forward, they can request to be referred to by pseudonym in any and all law enforcement reports." The charge defined "pseudonym" consistent with statute as "a set of initials or fictitious name chosen by the victim to designate the victim in all public files and records concerning the offense, including police summary reports, press releases, and records of judicial proceedings."[2] *See* Tex. Code Crim. Proc. art. 58.001(2) (defining pseudonym). No objected-to part of the charge included the word "victim," thus distinguishing this case from the

---

[2] Calvery did not object to or complain on appeal about the definition of "pseudonym."

opinions of the Waco and Eastland courts of appeals regarding the harmful effect of using the word "victim" in the charge. *See Veteto*, 8 S.W.3d at 816-17; *Talkington*, 682 S.W.2d at 674-75. Further, the use of initials in the charge attenuated any effect of the underlying words "juvenile" and victim," particularly in light of the fact that, as discussed below, neither counsel used "JV1," "Juvenile Victim 1," "juvenile," or "victim" in closing argument. The entirety of the jury charge weighs against a finding of harm.

The second *Almanza* factor calls for consideration of the entirety of the trial evidence, including the contested issues and the weight of the probative evidence. *Campbell v. State*, 664 S.W.3d 240, 248 (Tex. Crim. App. 2022) (citing *Almanza*, 686 S.W.2d at 171). Our review of the evidence shows the following:

- Alice's testimony was clear and unequivocal on the essential elements of the offense.

- Her outburst in 2018 at the water park was consistent with the more detailed accounts she provided to therapists and Duck and in her testimony.

- She testified to specific acts committed and a range of dates during which they were committed that, when believed, satisfied the elements of the charge.

- Calvery was the only household resident who could have conducted the assaults as Alice described them; her brothers were all younger than ten years old when the assaults occurred and Calvery was the only adult male.

- Though the offenses occurred thirteen to sixteen years before the trial, Alice was at least nine years old when they began and twenty-six when she testified about them, which the jury could have reasonably inferred made Alice's testimony more credible.

11

- Alice's testimony that she always had her own room and that the offenses occurred after everyone else was asleep provide a credible explanation for how seventy-five such offenses could occur over four years in a crowded home without anyone else witnessing unusual activity.

- Alice's request that family members leave before her testimony does not undercut her veracity, as Calvery claims, because she expressed concern for the effect on her family of hearing the accusations.

- The last minor child was within three months of turning eighteen and soon would age out of custody decrees, which diminishes Calvery's theory that Alice's accusations were concocted with Mother as fodder for a custody dispute. Additionally, Alice testified that this theory was "laughable" and meritless because the experience had been so painful for her. She said she had nothing to gain from testifying except that she wanted to prevent Calvery from harming another person, and the jury could have found this testimony credible.

The state of the evidence weighs against a finding of harm.

Turning to the arguments of counsel, though the prosecutor used the word "victim" to describe Alice during the guilt/innocence phase of the trial, we agree that "the fact that a prosecutor is of that view would not surprise a reasonable juror, nor would the prosecutor's use of the word in argument or voir dire generally be understood as anything other than the contention of the prosecution." *See Weatherly v. State*, 283 S.W.3d 481, 486 (Tex. App.—Beaumont 2009, pet. ref'd); *see also Davis v. State*, No. 05-18-00398-CR, 2019 WL 2442883, at *2 (Tex. App.—Dallas June 12, 2019) (mem. op.) (not designated for publication) ("Further, the word 'victim' is mild, non-prejudicial, and is commonly used at trial in a neutral manner to describe the events in question")

While the State explained that "JV1" meant "Juvenile Victim 1" during opening statements—an accurate preview of Duck's testimony—neither counsel used the terms "JV1" or "Juvenile Victim" during argument immediately preceding the jury's deliberations.

Additionally, the charge explicitly instructed the jury, "Statements made by the lawyers are not evidence." The arguments of counsel weigh against a finding of harm.

Finally, there is no other relevant information in the record that reveals harm. The State did not use the terms "JV-1" or "juvenile victim" during voir dire or at other points during trial other than the limited instances mentioned above. Moreover, there is no statement by a juror or other indication that the use of "JV1" in the charge was interpreted as an instruction that the State had proved Alice was a juvenile and a victim.

In sum, all four *Almanza* factors weigh against a finding of harm. Therefore, even if the court erred by using the term "JV1" in its charge, the record does not show that Calvery was actually harmed by that error.

**The Due Process claim was waived by lack of objection.**

The due-process aspect of Calvery's appellate complaint was not preserved at trial. Constitutional due process complaints must be preserved by an objection at trial. *See Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009) ("our prior decisions make clear that numerous constitutional rights, including those that implicate a defendant's due process rights, may be forfeited for purposes of appellate review unless properly preserved."); *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990) (holding that defendant was required to object at trial that his constitutional right to due process was violated in order to preserve the issue for appeal); *Garcia v. State*, No. 02-21-00203-CR, 2022 WL 17173127, at *2 (Tex. App.— Fort Worth Nov. 23, 2022, pet. ref'd) (mem. op.) (not designated for publication). When objecting at trial, Calvery did not assert that the inclusion of the term "JV-1" violated his right to

13

due process as he now asserts on appeal. The due process aspect of Calvery's complaint is waived and overruled.

We overrule issue one.

**The record contains sufficient evidence of Calvery's identity.**

By issue two, Calvery contends that the State failed to prove his identity. He focuses on the in-court identification, pointing to inconsistencies in the witnesses' description of the clothing of the person they identified as the defendant; Alice described his clothing as a "[b]lack suit and white shirt with a tie," while Duck described it as "a dark blue jacket and a light blue shirt." Mother identified Calvery as being "at the defendant's table in a navy blue suit." Calvery also notes the failure of the State to ask the court to let the record reflect that a witness had identified the defendant.

When reviewing the sufficiency of the evidence in a criminal case, we view all the evidence in the light most favorable to the judgment to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020). "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Stahmann*, 602 S.W.3d at 577. "Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id.*, and are "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). We must presume the factfinder resolved conflicting inferences in favor of the conviction. *Jackson*, 443 U.S. at 326. We must also

14

consider the combined and cumulative force of all the inculpatory evidence and reasonable inferences drawn therefrom; and be careful not to engage in a "divide and conquer" or "thirteenth juror" analysis. *See Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex Crim. App. 2007).

Evidence of identification is sufficient to support a conviction if "from a totality of the circumstances the jury was adequately apprised that the witnesses were referring to [the defendant]." *Rohlfing v. State*, 612 S.W.2d 598, 601 (Tex. Crim. App. 1981). In *Rohlfing*, the defendant complained that he was not identified as the perpetrator because, although witnesses identified the perpetrator as a person in the courtroom and described the perpetrator's appearance, the prosecutor never expressly asked that the record reflect that witnesses had identified the defendant as the perpetrator. *Id*. at 600-01. The Court of Criminal Appeals rejected that argument, explaining that the jury could assess the witnesses' identification of the defendant in court. *Id.* at 601. The court held that, absent any indication before appeal that the jury was misled by the in-court identification procedure, courts should not presume that witnesses identified somebody other than the appellant and that the jury nevertheless convicted appellant without evidence that he was the perpetrator. *Id.* The Court also noted that appellant did not object to the identification procedure and did not offer a bill of exception detailing circumstances that would show confusion or misidentification.[3] *Id.*

The jury in this case heard and saw the witnesses identify a person wearing either a dark blue jacket, a navy blue suit, or a black suit, and a white or light blue shirt. They could

---

[3] Calvery asserts that, to the extent that the *Rohlfing* opinion places any burden on defendants to "clear up the State's evidentiary failures at trial, it was wrongly decided." As an intermediate court, we are bound to follow the decisions of the Court of Criminal Appeals. *Ex parte Reyes-Martinez*, 653 S.W.3d 273, 284 (Tex. App.—Austin 2022, no pet.); *see* Tex. Const. art. V, § 5(a) (providing that Court of Criminal Appeals is final authority for interpreting criminal law in Texas).

assess whether these variations undermined the identification of Calvery. *Cf. Petro v. State*, 176 S.W.3d 407, 412 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (holding any discrepancies in descriptions of robber's clothing and physical characteristics are best left for jury's evaluation of credibility and demeanor of witnesses). There is no bill of exception detailing circumstances that would show confusion or misidentification. This is not a case of witnesses identifying a stranger met during the commission of the crime—Calvery is Mother's ex-husband and Alice's former stepfather. As in *Rohlfing*, nothing in the record indicates that anyone other than Calvery was identified as the perpetrator or that the jury was misled. 612 S.W.2d at 601. From the totality of the evidence, we conclude that the State proved the identity of the defendant at trial beyond a reasonable doubt.

We overrule issue two.

## CONCLUSION

We affirm the judgment of conviction.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: August 29, 2024

Do Not Publish

16